IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA  :
                          :
          v.              :   CRIMINAL ACTION NO.
                          :   1:12-CR-383-CAP-JSA
HEATH J. KELLOGG a/k/a "Red";   :
STACY P. SMITH a/k/a "Unc";     :
JAMES C. KELLOGG;               :
CAMERON R. LONGSHORE;           :
and KENYADA BARRION             :

## ORDER AND REPORT AND RECOMMENDATION

The Indictment alleges that the Defendants engaged in a conspiracy to make and sell counterfeit United States currency in violation of Title 18, U.S.C., § 371, and other offenses, from at least February 1, 2011 through November 15, 2012. *See* Indictment [13] at 1.  On November 15, 2012, law enforcement arrested Defendants Heath Kellogg, James Kellogg and Stacy Smith, and executed searches pursuant to warrants at their homes.  Subsequently, law enforcement also arrested Defendant Kenyada Barrion and obtained certain evidence during that arrest. Those Defendants moved to suppress various evidence obtained during the investigation, arguing that the search warrants were unsupported by probable cause, that certain searches exceeded the scope of any warrants and were unjustified by any exception to the warrant requirement, and that certain inculpatory statements were extracted in violation of their Fourth, Fifth and/or

Sixth Amendment rights.

Defendants Heath Kellogg and Cameron Longshore also moved to suppress pretrial identification evidence.  This matter was thus submitted to the undersigned on the following motions to suppress and related motions: [73] [75][78] [80][81][82] [84][85][86][93][94] [95] [102] [108] [109] [113] [115] [119] [137] [139].

The Court held a two day evidentiary hearing on these motions on January 15 and 18, 2013 [128][129].  The Government and Defendants Heath Kellogg, James Kellogg and Stacy Smith submitted post-hearing briefs on a schedule that was modified several times by the Court, with the last brief submitted on May 15, 2013. [137][139][141][148][150].

Since the evidentiary hearing, three of the Defendants who filed motions to suppress have pleaded guilty, that is, Kenyada Barrion, James Kellogg and Stacy Smith.  Thus, the Court **RECOMMENDS** that the motions to suppress and other motions filed by these Defendants be **DENIED** as moot and/or as waived by virtue of the guilty pleas. This pertains to Defendant Smith's motions [85][93] [94][95][119]; Defendant James Kellogg's motions [73][137]; and Defendant Barrion's motions [75][86].

The Court **GRANTS** Heath Kellogg's motion to adopt [115] James Kellogg's Motion to Suppress [113].  Thus, despite James Kellogg's plea, the Court will discuss the merits of this motion [113] as it relates to Defendant Heath Kellogg.  As discussed below, the Court **RECOMMENDS** that this motion [113] be **DENIED** on the merits.

As explained below, the Court **RECOMMENDS** that the motions filed by the remaining Defendants also be **DENIED**, that is, the motions filed by Defendants Heath Kellogg [80][81][82] [84][102][108][109] and Cameron Longshore [78][1].

---

[1] As noted below, it appears that Cameron Longshore's motion may have been abandoned, as the Defendant did not file a post-hearing brief.  Nevertheless, as explained, the Court discussed the merits of the motion and recommends denial on that basis as well.

# FINDINGS OF FACT

## I.    The Facts Set Out In The Search And Arrest Warrant Applications

### A.    *The November 14, 2012 Applications*

On November 14, 2012, the U.S. Secret Service applied for and received warrants from U.S. Magistrate Judge Alan J. Baverman to search the following premises:

- The residence of Defendant Stacy Smith, 1139 Commons Lane, Marietta, GA 30062 ("Commons Lane Premises") [Gov't Ex. 17[2] (application), 18 (warrant)];

- The residence of Defendant Heath Kellogg, 208 Don John Trail, Woodstock, GA 30189 ("Don John Trail Premises") [Gov't Ex. 4 (warrant), 5 (application)]; and

- An address used as both a business address of Defendant Heath Kellogg and the residence of Defendant James Kellogg, located at 772 Sterling Road, Marietta, GA 30066 ("Sterling Road Premises") [Gov't

---

[2] All exhibit references, unless otherwise specified, refer to exhibits introduced at the evidentiary hearing on January 15, 2013 and January 18, 2013 [117][120].

Ex. 1 (warrant), 2 (application)].

Magistrate Judge Baverman also issued a criminal complaint authorizing the arrests of Defendants Stacy Smith and Heath Kellogg on November 14, 2012. Gov't Ex. 16.  The applications for each of these search warrants and the criminal complaint were supported by the same affidavit, dated November 14, 2012, from Special Agent ("S/A") Alexandre Herrera of the United States Secret Service ("November 14 Aff.") [*See, e.g.*, Gov't Ex. 2.] The November 14 Affidavit established, in sum:

A unique type of $50 counterfeit Federal Reserve Notes circulated in high amounts in 2011 and 2012, particularly in the Atlanta area ("Subject Notes"). November 14 Aff. ¶ 11.  These notes were likely manufactured using an inkjet printer and toner laser printer.  *Id.* ¶ 12.  Counterfeiters of notes such as these also typically use a scanner or all-in-one printer to scan the image of genuine Federal Reserve Notes.  *Id.* ¶¶ 6, 7.

In June 2012, Cooperating Defendant 1 ("CD1") was arrested in Conyers, Georgia for passing some of the Subject Notes.  *Id* ¶ 24.  According to CD1, who was interviewed by law enforcement, he received the Subject Notes from an individual named "Tony Fetti."  *Id.*  On one occasion, Tony Fetti sold CD1

counterfeit currency with a face value of $1,000 for $250 in genuine currency.  *Id.*
CD1 stated that Tony Fetti was accompanied during these counterfeit notes
transactions by another individual who CD1 knew as "Unc."  *Id.*

CD1 stated that "Unc" may be Tony Fetti's source, and that "Unc" sold
counterfeit directly to CD1 in the past.  *Id.* ¶¶ 24, 27.  CD1 described "Unc" as the
"printer" of the Subject Notes.  *Id.* ¶ 27.  "Unc" bailed CD1 out of jail on previous
occasions when CD1 was arrested for passing counterfeit currency.  *Id.* ¶ 28.  CD1
provided agents with "Unc's" cell phone number, and stated that the caller
identification information displayed when "Unc" called was "Stacy Smith."  *Id.*
"Unc"/Stacy Smith told CD1 that he stays in Marietta, Georgia, and he previously
made statements about being "in the lab."  *Id.*  CD1 provided further details as to
how "Unc" manufactured counterfeit, including the source of the paper, certain
pens that he used, and the like.  *Id.*  CD1 also identified two vehicles that "Unc"
used while selling counterfeit within the preceding year.  *Id.*

The agents researched the telephone number that CD1 provided for "Unc,"
and confirmed that it was registered in the name Stacy Smith.  *Id.* ¶ 36.  Stacy
Smith was a subject of a prior Secret Service counterfeiting investigation.  *Id*. ¶ 38.
Secret Service interviewed at least one witness who confirmed that Stacy Smith
used that telephone number, and had passed counterfeit to the witness in the past.

*Id.* ¶¶ 38-39.  Law enforcement also presented a photo-lineup including Stacy

Smith's photograph to CD1, and CD1 identified Smith as "Unc."  *Id.* ¶ 41.

According to database searches, the Commons Lane Premises was a likely address

for Stacy Smith.  *Id.* ¶ 47.

On August 10, 2012, Secret Service agents conducted an undercover

purchase of Subject Notes through another cooperating defendant, CD2.  *Id.* ¶¶ 52-

53.  On that day, CD2 first met a counterfeit dealer he knew as "Supreme," later

identified as Defendant Kenyada Barrion, to arrange to purchase a certain amount

of Subject Notes.  *Id.*  Agents saw Barrion then drive to a location on Richard Road

in Decatur, Georgia, where he picked up Defendant Cameron Longshore, and the

two of them drove to a night club in Atlanta.  *Id.*  In the meantime, other agents had

been watching the Commons Lane Premises.  *Id.* Those agents saw Defendant

Stacy Smith leave the Commons Lane Premises and travel to meet Barrion and

Longshore at the night club parking lot.  *Id.*  After meeting with Smith, Barrion and

Longshore met again with CD2 and provided CD2 with $2,000 in Subject Notes in

exchange for $900 in genuine currency.  *Id.*

The agents conducted another controlled purchase operation on August 14,

2012.  *Id.* ¶¶ 54-59.  CD2 initiated that purchase by calling Barrion and requesting

to purchase another $2,000 in Subject Notes.  *Id.*  Agents had previously seen

Defendant Smith leave the Commons Lane Premises and arrive at the Don John Trail Premises holding a piece of paper in his hand. *Id.* Then, after CD2 placed his call to Barrion, Smith left the Don John Trail Premises and met with Barrion and Ian Longshore at a gas station. *Id.* Afterwards, Barrion and Longshore drove to meet CD2 and sold him $2,000 in Subject Notes. *Id.*

According to database searches as well as the Douglas County probation office, Defendant Heath Kellogg lived at the Don John Trail Premises. *Id.* ¶¶ 61-62. Kellogg had a criminal history in Georgia with multiple forgery and property crimes. *Id.* at 60. Database searches show Kellogg listed as a graphics and web designer as the owner of Realseriousink, with the business address at the Sterling Road Premises. *Id.* ¶ 63. Cell phone records and credit reports list the Sterling Road address as Heath Kellogg's address, which is also where his father, Defendant James Kellogg, resides. *Id.* at 64-66.

The next day, August 15, 2012, the agents saw Heath Kellogg and his wife arrive and go inside the Commons Lane Premises where they spent about 10 minutes before leaving. *Id.* ¶ 67. Their car was seen returning to the Don John Trail Premises later that same afternoon. *Id.*

On August 21, 2012, agents saw Heath Kellogg travel from the Don John

Trail Premises to the Sterling Road Premises. *Id.* at 73. He left the Sterling Road Premises approximately 10 minutes later with a manila envelope he carefully placed in the trunk. *Id.* The agents were unable to follow Heath Kellogg because of his excessively fast driving. *Id.* The agents saw Heath Kellogg return to the Don John Trail Premises several hours later that afternoon. *Id.* at 74.

On the evening of August 21, the agents saw Heath Kellogg pick up what appeared to be a rental car. *Id.* at 75. They followed him, saw him enter an OfficeMax store, where he purchased printer toner and ink cartridges. *Id.* The agents were unable to follow him as he drove away "because of the high speeds and sporadic driving," suggesting counter-surveillance efforts. *Id.* at ¶¶ 75, 82. However, agents saw Heath Kellogg about 20 minutes later leaving the parking lot of a restaurant where Stacy Smith was eating that evening. *Id.* at 77. Kellogg departed "on foot into a nearby wooded area." *Id.*

According to OfficeMax personnel, Heath Kellogg made various purchases of toner and ink cartridges totaling over $1,300 for the course of the preceding year. *Id.* ¶ 81. Several of these cartridges were for use in large commercial printers. *Id.*

In October 2012, agents conducted multiple interviews with a counterfeiter

named Edikan Ekpo.  Ekpo stated that he received counterfeit notes from an

individual he knew as "Red."  *Id.* ¶ 84.  In an initial interview he described "Red"

as a black male between the ages of 45 and 55, and that he was clean cut with black

hair.  *Id.* ¶ 86.  In another interview on October 11, 2012, according to the warrant

application, Ekpo identified "Red" as a mixed race male, and he positively

identified a photograph of Heath Kellogg as "Red."  *Id.*  Ekpo stated that he was

present with "Red" when "Red" printed counterfeit checks from a laptop on at least

one occasion.  *Id.*  Ekpo also knew "Unc" and stated that "Unc" was "Red's"

driver.  *Id.* ¶ 88.  "Red" told Ekpo that he used to use an inkjet printer but now uses

a printing press for counterfeiting activity.  *Id.* ¶ 90.  Ekpo generally dealt directly

with "Red" and explained details about "Red's" operations, but Ekpo stated that

after a big counterfeiting arrest in Atlanta "not long ago," "Red" no longer dealt

directly with Ekpo.  *Id.* ¶¶ 89-90.

## II.  Facts Established In The Evidentiary Hearing[3]

### A.  *Law Enforcement Identification Of Defendant Cameron Longshore*

Secret Service Task Force Officer, and Dekalb County (Ga) Detective Patrick Mitchell helped conduct surveillance for the two undercover buys on August 10 and August 14, 2012, in Dekalb County, Georgia. [128] at 44-45.  On August 10, Officer Mitchell saw the Secret Service's Confidential Informant meet with the driver of a maroon Ford Taurus in a gas station parking lot in Dekalb County.  *Id.*  The car drove to a location on Richard Road, also in Dekalb County, where other officers observed the individual later identified as Cameron Longshore enter the car.  *Id.* at 46-47.  At the time, Longshore's identity was unknown and the officers simply observed him as an unidentified African-American male with dreadlocks.  *Id.*  Officer Mitchell later saw this individual riding in the maroon Taurus, and standing with the car during two stops in parking lots.  *Id.* 47-48, 78.  Officer Mitchell described the individual, later identified as Defendant Cameron Longshore, as being a tall, dark-skinned black male with dreadlocks, and a goatee, beard and mustache.   *Id.* at 78.

---

[3] There will be some redundancy in the summary of the testimony of the evidentiary hearing, because certain testimony overlapped with facts set out in the affidavit supporting the warrants.

The surveillance team searched internet databases and found a photograph of Cameron Longshore from the Dekalb County law enforcement database. *Id.* at 47, 74.  Officer Mitchell recognized the individual in this photograph as the same individual who was wearing dreadlocks and riding in the Maroon Ford.  *Id.* at 79.  Officer Mitchell again recognized this individual in Court during the evidentiary hearing, and identified him as Defendant Cameron Longshore.  *Id.* at 82-83.

    B.   *Identification Of Defendant Heath Kellogg By Edikan Ekpo*

According to the agents who interviewed Ekpo on October 11, 2012, Ekpo referred to a fellow counterfeiter who Ekpo knew only as "Red." [128] at 101.  Ekpo stated that he had received counterfeit checks from Red. [128] at 101, 157.  Ekpo also referred to another man he knew as "Unc," who Ekpo claimed was "Red's" middleman.  *Id.* at 102.  One of the agents (S/A Lewis) recalled Ekpo saying that he knew "Red" for two years.  *See* [129] at 268-269.  The other agent (S/A Hambry) stated that Ekpo met with "Red" "several" times, but did not specify how many times or how long he knew "Red." [128] at 101, 125.  When the agents asked Ekpo how long it had been since he had seen Red, Ekpo stated words to the effect "it would have been within the last year, nothing real recent."  *Id.* at 126.

One of the agents, S/A Hambry, recalled displaying to Ekpo two

photographs of Defendant Heath Kellogg, with the Defendant's name and all other personal identifying information covered. [128] at 121-122.  One of the photographs was from the Defendant's driver's license and the other was from the Georgia Department of Corrections (in which the Defendant was wearing jail attire). *Id.*  Ekpo identified the person in the photograph, that is, the Defendant, as the counterfeiter he had been referring to as "Red." [128] at 102.  S/A Hambry stated that Ekpo described Red as a light skinned or mixed race black man and was "a shorter man, not very tall." *Id.* at 124.  Ekpo gave no information as to body build, speech or other identifying information for Red.  S/A Hambry stated that Ekpo described Red as having lived in Decatur, Geogia, but had moved to Tennessee.  *Id.*  Apparently, the Government has no facts suggesting that Defendant Kellogg lived in Decatur or Tennessee.

Another agent who was present for the Ekpo interview, S/A Lewis, stated that he believed Ekpo reviewed only one photograph of Defendant Kellogg, but "its been a while" and "there might have been an additional photo...." *Id.* at 157. S/A Lewis stated that Ekpo "immediately" identified Red as Defendant Heath Kellogg.  *Id.* at 158.  S/A Lewis testified that Ekpo said he knew "Red" from having obtained treasury checks from him, and that they had "conducted a couple of transactions amongst each other ...." *Id.* at 156.  S/A Lewis initially recalled that

Ekpo had described Red during the October 2012 interview. [129] at 265-266.
After reviewing his notes of the interview, however, S/A Lewis indicated that this
recollection had been incorrect and that Ekpo did not, in fact, describe "Red's"
physical characteristics.  *Id.* at 266-267.

The Government at the evidentiary hearing introduced copies of two
photographs of Defendant Heath Kellogg that S/A Hambry stated he showed to
Ekpo during the October 2012 interview. [128] at 144-145, Gov't Ex. 8.  Neither of
these two photographs depicted the Defendant in jail attire.  *Id.*  S/A Hambry
repeated his recollection that he had shown such a photograph to Ekpo, although
the Government did not introduce any such photograph.  *Id.*

   C.    *The Execution Of the Search and Arrest Warrants*

   1.    The execution of the warrant relating to Defendant Smith[4]

On November 15, 2012, the Secret Service and other law enforcement

---

[4] Although Defendant Smith has entered a plea of guilty, and thus has
waived his motions to suppress, the Court provides this background as helpful to
the discussion of Defendant Heath Kellogg's remaining motions.  For one thing,
Defendant Heath Kellogg objects to a search of a storage unit of which he and
Defendant Smith were co-occupants.  *See* Heath Kellogg's post-hearing brief
[139] at 1.  The Government's theory is that Defendant Smith had authority to and
did voluntarily and knowingly consent to this search.  Thus, the Court provides this
background to the extent Defendant Kellogg suggests that this consent was
illegally obtained.

personnel executed the search and arrest warrants issued on November 14th.  S/A Herrerra testified about the execution of the warrant at Smith's residence, that is, the Commons Lane Premises. [128] at 273-274.  The agents arrived at Smith's residence at approximately 6:45 a.m. that morning.  *Id.* at 335-336, 340.  Approximately six Secret Service agents two Cobb County (Georgia) Sheriff's Department officers participated in the search.  *Id.* at 274.  All agents were armed and wore body armor.  *Id.*

When the Defendant opened the door, the agents entered with weapons drawn.  *Id.* at 274-275.  The officers ordered the Defendant to raise his hands and then placed handcuffs on him during a protective sweep of the house.  *Id.*  The agents, however, obtained clothing for Defendant (who was only in boxer shorts and perhaps a t-shirt when the agents arrived), and offered him the opportunity to use the restroom.  *Id.* at 277-278, 341.

After the security sweep, the agents told Smith why they were there.  *Id.* at 337-339.  They told Smith that they were executing a search warrant and also arresting him, that warrants were also being executed at Defendant Heath Kellogg's house, that they understood that unlike Smith Defendant Kellogg had a substantial criminal history, and that Smith's cooperation would be "noted."  *Id.* at 339.

After that, at approximately 7:10 a.m., the agents informed Defendant Smith of his *Miranda* rights. *Id.* at 339-340; Gov't Ex. 20. The agents read the form to Smith and provided him a copy to read along. *Id.* at 279-280. S/A Herrerra asked the Defendant whether he understood his rights, and "he said yes." *Id.* "And then we asked him, just like the form says, are you willing to waive these rights and talk to us and he replied yes." *Id.* The Defendant then executed the waiver form. *Id.;* Gov't Ex. 20. The agents removed the handcuffs although S/A Herrera could not recall whether that happened prior to the advice of rights or at the moment Defendant agreed to waive his rights. [129] at 279. Before agreeing to answer questions, Smith first asked the agents how much they knew. *Id.* at 281. The agents responded simply by showing Smith a photograph of Heath Kellogg, and Smith thereafter made incriminating statements. *Id.* Smith was cooperative and never sought to remain silent or consult with an attorney. *Id.* at 281-282.

During the interview, Smith gave the agents permission to search two vehicles that were parked at his home, and a storage unit that Smith stated he shared with Defendant Heath Kellogg. *Id.* at 284-285. The agents obtained a key to the unit during the search at Smith's residence, and Smith explained to them where they could find the unit and what was stored within. *Id.* Smith gave verbal permission for these additional searches and executed a consent form. *Id.* at 286-

288, Gov't Ex. 21.

After executing this series of search warrants, Secret Service agents located and searched the storage unit apparently shared by Smith and Heath Kellogg. [129] at 292-293.  The agents did so on the basis of the consent provided by Defendant Smith and using they key obtained during the search of Defendant Smith's residence.  *Id.* The agents found printers and cartridges apparently for use in counterfeiting.  *Id.*

> 2.    The execution of the search warrant at Heath Kellogg's house and the statements obtained as a result

Also on November 15, 2012, at about 7:00 a.m., at the same time that S/A Herrerra and others were conducting the search at Defendant Smith's home, S/A Hamby and others arrived at Defendant Heath Kellogg's residence to execute a search warrant there. [128] at 48-49; [129] at 319.  The Defendant's wife, Latasha Kellogg, testified that she heard the doorbell ring and that as she was walking towards the door to open it, "the door was busted open" and "men [were] coming through the door with guns." [129] at 398.  The officers entering the home were members of the Cherokee County (Georgia) SWAT team, who were dressed in tactical gear, holding assault rifles, and wearing sidearms. [128] at 49-51, 58.  Mrs. Kellogg never heard the officers announce themselves before breaking the

door down. [129] at 396.  Numerous SWAT officers entered the house, having

used a battering ram to force open (and damage) the front door. [128] at 90-91;

[129] at 417.  Mrs. Kellogg testified that the officers pointed weapons at her and

her young children and ordered them to the ground. [129] at 399-402.

The officers found Heath Kellogg upstairs in a bathroom. [129] at 402-403.

Mrs. Kellogg was permitted to take her children to school, but a Secret Service

officer insisted on riding in the car with her, and having another agent follow in a

separate car.  *Id.* at 404-407.

When the Defendant was brought downstairs, the agents informed him that

he was under arrest and advised him of his *Miranda* rights by reading and

furnishing him a Secret Service form. [128] at 92-93; Gov't Ex. 7.  The Defendant

was handcuffed and refused to sign the form.  *See* [128] at 92-93.  He indicated,

however, that he understood his rights, and wished to speak with an attorney.  *Id.* at

93-94.

The Defendant remained restrained in handcuffs, sitting on his living room

sofa, while the search progressed.  *Id.* at 53.  From that location, the Defendant

could see the agents carrying various items discovered from the basement of the

house.  *Id.* at 53-54.  The agents were also discussing with each other what they

were finding.  *Id.* at 110-111.  These discussions generally occurred downstairs, but because the Defendant's residence was a split level there was no door separating the downstairs from the main level where the Defendant was being restrained.  *Id.*  S/A Hamby could not say whether the Defendant may have overheard these discussions or not.  *Id.*

In any event, as the search progressed and as agents began bringing apparent evidence up from the basement, the Defendant announced that he wanted to talk to the agents after all. [128] at 52-53, 63, 96.  The Defendant stated words to the effect, "I wanted to talk about – can I talk now."  *Id.* at 112.

The agents initially declined to take the Defendant up on his invitation to talk.  *Id.* at 97-98.  Instead, the agents took the Defendant to the Secret Service field office at approximately 8:30 a.m. [129] at 294-295.  At the office, agents reminded the Defendant of his *Miranda* rights, and he stated that he had been advised of and understood those rights. [129] at 295.  The agents did not otherwise ask the Defendant to execute, and he did not execute, any written waiver form.  *Id.* at 323.

After this discussion, the Defendant indicated that he still wished to speak with the agents despite his earlier indication that he wanted to await consultation

with a lawyer.  *Id.* at 296.  S/A Herrerra, who at that point had taken over the

questioning, brought up the topic of counterfeiting, to which Defendant stated

"That's what I want to talk about."  *Id.*  S/A Herrerra stated that the Defendant was

calm, relax and forthcoming, did most of the talking himself, and volunteered

several details that S/A Herrerra was unaware of.  *Id.* at 296-297.

   3.   The execution of the search warrants at James Kellogg's home[5]

   On the same day, November 15, 2012, another group of Secret Service

agents and Cobb County Sheriff's Deputies executed a search warrant for the home

of Defendant James Kellogg.  In addition to searching the house, the agents

searched the shed on Defendant's property and found alleged evidence of

counterfeiting activity.  The shed was in the back yard of the residence and within

the fence enclosing the property. [128] at 32-33.  On the basis of the results of the

November 15 search at the Sterling Road Premises and certain statements obtained

from Defendant James Kellogg, the agents obtained a second warrant that

permitted a further search of the Premises on November 16, 2012. [Gov't Ex. 25].

_____

   [5] Although James Kellogg has entered a guilty plea, these facts are discussed
because Heath Kellogg has moved to adopt James Kellogg's Motion to Suppress
the evidence obtained during the search at the Sterling Road Premises. [113][115].

# ANALYSIS

## I.  Legal Standards

### A.   *Challenging The Issuance Of A Search Warrant*

A magistrate judge asked to issue a search warrant must make a practical common sense decision, given all the facts set out in the application, that there is a fair probability that contraband or evidence of a crime will be found in a particular place. *See Illinois v. Gates*, 462 U.S. 213 (1983).  Courts reviewing the sufficiency of warrant applications after-the-fact should not do so in a hyper-technical manner; Rather, courts must employ a realistic and common-sense approach so as to encourage recourse to the warrant process and to recognize the significant deference afforded to the decisions of the issuing magistrate judge.  *Id.*; *United States v. Miller*, 24 F.3d 1357 (1994).

Moreover, regardless of whether it finds probable cause, the reviewing court must deny suppression on the grounds of good faith reliance unless the affidavit was so lacking in indicia of probable cause so as to render official belief in its existence entirely unreasonable.  *United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002).

B.    *Challenging the Voluntariness of Incriminating Statements*

In *Jackson v. Denno*, 378 U.S. 368 (1964), the Supreme Court held that

when a defendant objects to the introduction of a statement to law enforcement as

involuntary, due process requires the trial court to make an independent

determination that the statement was voluntary before it may be heard by the jury.

A two-part inquiry determines the admissibility of a self-incriminating statement.

First, the court must consider whether the Government complied with the

requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966). Second,

the court must consider whether the statement was voluntary. *United States v.

Jones*, 32 F.3d 1512, 1516 (11th Cir.1994).

In *Miranda*, 384 U.S. at 436, the Supreme Court held that a suspect who is

in custody must be advised of his right to remain silent and of his right to the

assistance of counsel prior to any interrogation by law enforcement.  The

Government has the burden to show the knowing and intelligent nature of a

*Miranda* waiver. *Id.* at 475.  The Supreme Court instructs courts to look for two

things:

> First, the relinquishment of the right must have been voluntary in the
> sense that it was the product of a free and deliberate choice rather than
> intimidation, coercion, or deception. Second, the waiver must have been
> made with a full awareness of both the nature of the right being

abandoned and the consequences of the decision to abandon it. Only if
the totality of the circumstances surrounding the interrogation reveal[s]
both an uncoerced choice and the requisite level of comprehension may
a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation

omitted).

Determining whether a statement is voluntary depends on whether, under all

of the surrounding circumstances, the statement was the product of the accused's

"free and rational" choice. *Jones*, 32 F.3d at 1516; *see Arizona v. Fulminate*, 499

U.S. 279, 285–88 (1991). The Eleventh Circuit has stated:

Sufficiently coercive conduct normally involves subjecting the accused
to an exhaustingly long interrogation, the application of physical force or
the threat to do so, or the making of a promise that induces a confession.
Isolated incidents of police deception, and discussions of realistic
penalties for cooperative and non-cooperative defendants, are normally
insufficient to preclude free choice.

*Jones*, 32 F.3d at 1517 (quotation omitted).

## II.     Heath Kellogg's Motions

Defendant Heath Kellogg has filed the following motions:

- A "Motion to Suppress In Court Identification" [80], which argues

  that the photographic identification by Edikan Ekpo was overly

suggestive and unreliable and must be suppressed;

- A "Motion to Suppress Statements" [82], which argues that Defendant's post-arrest statements to law enforcement were involuntarily made and in violation of *Miranda v. Arizona*;

- A "Motion to Sever" [84], which was mistakenly titled and later re-named a "Motion to Suppress" [108]. This motion seeks to suppress the fruits of the searches at both the Don John Trail and Sterling Road Premises for lack of probable cause.

- An "Amended Motion to Suppress Statements" [102], which added an additional theory of suppression as to Defendant's post-arrest statements, that is, that they were the fruit of the allegedly illegal search of the Don John Trail Premises on November 15, 2012;

- An "Amended Motion to Suppress" [109], which added additional grounds challenging the validity of the search warrants that authorized the search of the Don John Trail and Sterling Road Premises and also alleged that the agents illegally executed the warrant at the Don John Trail Premises by making multiple entries (to retrieve an item of evidence later referred to as the "jack press"); and

- a "Motion to Adopt" [115], by which Defendant seeks to adopt the suppression motion filed by James Kellogg as to the Sterling Road Premises [113];

Defendant Heath Kellogg filed a post-hearing brief that specifically focuses on two issues: the identification evidence by Edikan Ekpo and the search of the Don John Trail Premises [139].

A.    *The Pre-trial Identification By Ekpo Is Not Subject To Suppression*

Courts employ a two part test to determine whether identification procedures are constitutional.  The first question is whether the procedures used were unduly suggestive.  *See Manson v. Brathwaite*, 432 U.S. 98 (1977).  If so, the second question is whether, under the totality of the circumstances, the identification is reliable.  *See United States v. Beale*, 921 F.2d 1412 (11th Cir. 1991).   The factors to be considered in this analysis are: (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the prior description of the suspect; (4) the level of certainty of the identification; and (5) the time elapsed between the crime and the identification. *Id.*

Defendant argues that it was unduly suggestive for agents to show one or

more photographs to Ekpo depicting only the Defendant.  The Government does not argue otherwise, but rather focuses its argument on the second prong.  In other words, the Government argues that even if the procedure were unduly suggestive, the totality of the facts nevertheless establish reliability.

The identification here was far from perfect.  But considering the totality of the record, the Court agrees that the facts are sufficient.  Ekpo was a co-conspirator who previously met "Red" on several occasions, obtained counterfeit instruments from "Red," and knew "Red" in that capacity for some meaningful period of time. *See supra* at 12-14, November 14 Aff. ¶¶ 86-90. At least one time, Ekpo even stood close enough to the Defendant to watch him work with and print images of counterfeit instruments from his computer, and talked with "Red" about the equipment he used.  *See Id*.

To be sure, the record lacks precise information about the number and duration of these interactions between Ekpo and the Defendant.  While one agent recalled Ekpo saying he knew "Red" for two years, [129] at 268-269, the other testified that Ekpo gave no time frame but said he met with "Red" "several times." [128] at 101.  The Court concludes based on this testimony, and Ekpo's statements as reflected in the November 14 Affidavit, that he knew "Red," based on multiple interactions spanning a period of time.  While the specific duration of the

relationship is not well established, the facts suggest that the interactions between these conspirators were sufficient to give Ekpo a meaningful ability to identify "Red."  Indeed, importantly, Ekpo's identification of "Red" in the photographic was "immediate[]." [128] at 158.

Ekpo provided at least a partially accurate description of "Red."  The agents contradicted each other at the evidentiary hearing as to whether Ekpo described "Red" in the October 11, 2012 interview.  But there was no dispute that he provided a description in the earlier interview as a black male between the ages of 45 and 55, who was clean cut with black hair.  *Id.* ¶ 86.  Other than as to the age–which Defendant's counsel represents is closer to 35–this description was accurate.  And Ekpo provided certain other facts suggesting that he knew the Defendant, including that he knew the Defendant tended to use rental cars (which was consistent with the agent's surveillance), *see* November 14 Aff. ¶ 84, and that he knew the Defendant's associate Stacy Smith and his nickname ("Unc").

Other information provided by Ekpo was not accurate, including that he believed "Red" lived in Decatur. *See supra* at 12-14.  And Ekpo acknowledged that his most recent dealings with "Red," from at least June 2012 onwards, were through "Unc" or other intermediaries.  *See id.*  Defendant obviously can use some of these and other imperfections in cross-examination or otherwise at trial.  But in

the totality the identification is sufficiently reliable to survive suppression.

This is not the case of a stranger trying to identify a perpetrator he saw one time during the stress of witnessing or experiencing a crime. This is the case of a co-conspirator, who stated that he knew "Red" based on several interactions over a period of time (as much as two years, according to one agent's recollection), who engaged in transactions with "Red," who sat or stood close to "Red" while looking at the same computer screen, who knew certain details about "Red" and gave a partially correct general description of "Red," and who immediately identified "Red" in the photograph. The facts show that Ekpo's identification, while imperfect, was sufficiently reliable to survive suppression. *See United States v. Porter*, 221 Fed.Appx. 836, 841 (11th Cir. 2007) (unpublished) (identification reliable despite unduly suggestive procedure where witness and defendant were former conspirators who had participated in drug transactions together and where defense counsel was able to use cross-examination to explore flaws such as the passage of time between the identification and the witness's interactions with defendant); *United States v. Perez*, 138 Fed.Appx. 379, 381 (2d Cir. 2005) ("though the procedures used in obtaining the identification of Perez were suggestive, the identification by one of his co-conspirators was itself reliable.") Thus, Defendant's Motion [80] should be denied.

B.   *The Search of Heath Kellogg's Residence Is Not Subject To Suppression*

Defendant Heath Kellogg argues that the facts set out in the November 14th Affidavit failed to show probable cause to believe that he was engaged in criminal activity and that evidence of that activity would likely be found at the Don John Trail Premises.  The Court is not free, however, to re-decide the existence of probable cause.  Rather, as a reviewing court, "we afford 'great deference' to the determination of a magistrate judge that a search warrant affidavit is supported by probable cause, and we uphold the determination of the magistrate judge so long as he 'had a substantial basis for concluding that a search would uncover evidence of wrongdoing.'" *United States v. Joseph*, 709 F.3d 1082, 1093 (11th Cir. 2013) (quoting *Gates*, 462 U.S. at 236).  Moreover, the Court must deny suppression on the grounds of good faith reliance unless the affidavit was so lacking in indicia of probable cause so as to render official belief in its existence entirely unreasonable. *United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002).  Defendant cannot meet his burden to show suppression is warranted here.

Certainly, the facts in the affidavit as to Heath Kellogg and this residence are not overwhelming.  But the affidavit showed, through the statements of Ekpo, that Heath Kellogg was a counterfeiter associated with "Unc," who the agents had determined based on substantial information to be Defendant Stacy Smith.  The

investigation corroborated Heath Kellogg's associations with Stacy Smith, including by surveillance observations that Smith was at Kellogg's residence before leaving to meet Barrion for the undercover sale to CD2. *See* November 14 Aff. ¶¶ 54-59.

The affidavit also showed that Heath Kellogg bought over $1,000 worth of toner and inkjet materials. Moreover, he took the curious step of renting a car to drive to OfficeMax to make such purchases, and then afterwards engaged in what the agents concluded was counter-surveillance techniques to successfully shake the agents' tail.

Defendant suggests there are no facts suggesting the presence of evidence at the Don John Trail Premises. This fails, at least pursuant to the deferential standards that the Court must apply. The agents specifically observed Co-Defendant Stacy Smith–described by Ekpo as "Red"'s intermediary–visit the Don John Trail Premises in August 2012 immediately before one of the undercover buys. *See* November 14 Aff. ¶¶ 54-59. Presumably, Smith was there to meet with his Co-Defendant, Kellogg, and the agents saw Smith bring paperwork of some kind into the house. *Id.* It could be inferred that the Co-Defendants used the Don John Trail Premises as a place to conspire with each other, with documents in hand. This supports a finding that evidence would fairly probably be found there.

Further, after leaving the Don John Trail Premises on August 14, 2012, Smith met Co-Defendant Barrion in a parking lot immediately before Barrion sold counterfeit notes to the CI. *See* November 14 Affidavit ¶¶ 54-59.  The affidavit states that "the distribution of CFT FRN's begins at the location where the CFT FRN's are being produced, and the CFT FRN's are typically transported by vehicle thereafter." *Id*. ¶ 9.  The affidavit makes it clear that this production typically involves basic household equipment including all-in-one inkjet printers and scanners. *Id.* ¶¶ 6-7.

It could be inferred that Defendant Smith met with Barrion to supply him with counterfeit notes to sell to CD2, and that these counterfeit notes were obtained from the Don John Premises.  There was no indication that Defendant Smith made any other stops at locations where he could have picked up such contraband in between leaving the Don John Trail Premises and meeting with Barrion.

Defendant also returned back to the Don John Trail Premises on days after meeting at Smith's Commons Lane Premises. *Supra* at 8-9.  He also returned back to the Don John Trail Premises on at least one occasion after having picked up a manilla envelope from the "business" address of his supposed graphic design business, the Sterling Road Premises. *Id.*  Inferences could be drawn from these facts that Kellogg would bring back proceeds, contraband, documents or other

evidence to his residence, the Don John Trail Premises.

In the end, the question is not whether this Court, in retrospect, would issue this warrant.  The ultimate question is whether the affidavit is so devoid of facts so as to render reliance on the warrant wholly unreasonable.  The answer to that question is no.  There are sufficient facts connecting the residence to Defendant Heath Kellogg and the criminal activity to satisfy this highly deferential standard of review.  *See, e.g., United States v. Ross*, 487 F.3d 1120, 1123-1124 (8th Cir. 2007) (search warrant affidavit established at least enough facts to justify a reasonable good faith belief in the validity of a warrant to search a suspect's residence, where the affidavit recounted the use of trucks for hauling marijuana, where the owner of the residence used a particular truck to deliver marijuana, where that truck was parked in the driveway of the residence to be searched, where the suspect had a history of drug trafficking, and where a CI provided information that a shipment of marijuana was intended for the suspect).

Thus, Defendant's motions to suppress challenging the search warrant executed at the Don John Trail [84][108][109] should be denied, along with his Motions to Suppress Statements [82] to the extent premised on the allegedly illegal search.

C.    *Heath Kellogg's Motion to Suppress the "Jack Press" Obtained By Alleged Consent of His Wife Should Be Denied As Moot*

Defendant Health Kellogg argues that the Court should suppress a so-called "jack press" printing device recovered from his home several days after the search was executed. [139] at 10, 15-16.  The agents discovered and photographed this device during the execution of the search but because of its size were unable to take custody of it.  *Id.*  Thus, the agents informed the Defendant's wife that "we need to come back to retrieve the press...." [128] at 118.  The agents arranged with Mrs. Kellogg to return the following week, at which point the agents retrieved the press.  *Id.* at 100.  The agents lacked another warrant authorizing re-entry into the residence or seizure of the press.  Rather, the Government's legal theory has been that Mrs. Kellogg consented to the subsequent entry and seizure.

Whether Mrs. Kellogg voluntarily and knowingly consented is disputed. She testified that she did not understand that she had a choice, *see* [129] at 415, and the none of the agents expressly advised her otherwise, *see id.* at 410.

This issue is now moot, however.  The Government has decided to forego using the jack press itself as evidence in this case.  *See* [148] at 2-3.  The Government has stated that it may use the photographs taken of the press during the execution of the search warrant but that it will not use the actual press itself,

which was obtained several days later pursuant to the disputed consent.  In reliance on this representation, the Court sees the motion to suppress as moot on this point. Defendant Heath Kellogg, who had the opportunity to file a reply brief, does not argue otherwise.   Thus, the Defendant's Motion to Suppress evidence [109] should be denied as moot, on the issue of the jack press.[6]

      D.    *The Search Of The Sterling Road Premises Was Permissible*

As noted, Defendant Heath Kellogg's motions to suppress [84][108][109] also purport to challenge the search conducted at the Sterling Road Premises.   The Defendant also adopts James Kellogg's motion to suppress the evidence obtained from that Premises [113].  There are two issues raised by these various motions:

---

[6] Defendant Heath Kellogg, in addition to his motions to suppress, also seeks return of any property illegally seized by the Government [81].  To prevail on a motion for return of property, a criminal defendant must demonstrate that (1) he is entitled to lawful possession of the seized property; (2) the property is not contraband; and (3) either the seizure was illegal or the government's need for the property as evidence has ended. *See Sovereign News Co. v. United States*, 690 F.2d 569, 577 (6th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983).  With the arguable exception of the "jack press," the Defendant fails to show that any evidence was obtained from him illegally.  With the exception of the jack press, which the Government has certified it will not use at trial, the Defendant fails to show that the Government's need for the evidence has ended. As to the jack press, the Defendant fails to show that this material was not contraband.  Even if it were illegally obtained and suppressible at trial under the exclusionary rule, the Court would not order its return to the Defendant under Rule 41(e) if it were contraband of a crime.  Thus, the Court **RECOMMENDS** that Defendant's Motion for Return of Property [81] should be **DENIED**.

First, whether the warrant application in support of the Sterling Road Premises search was sufficiently supported by probable cause; and, Second, whether the agents impermissibly exceeded the scope of the warrant by searching a shed on the property that was not specifically included in the description of the premises to be searched.  Because Defendant James Kellogg was the one who asserted these issues, the Court reviews his arguments and the Government's response.  As explained below, the Defendant's position is meritless and these motions should be denied as to both Heath and James Kellogg.

1.      Heath Kellogg's Standing

The Government questions whether Heath Kellogg has standing to challenge the search at his father's residence, the Sterling Road Premises.  Whether a movant has a legitimate expectation of privacy in a particular premises is determined in the totality of the circumstances.  *See Rakas v. Illinois*, 439 U.S. 128, 130, n.1 (1978).  This can be established with proof that the movant owned or rented the premises or otherwise enjoyed "an unrestricted right of occupancy or custody and control of the premises . . . ."  *United States v. Bachner*, 706 F.2d 1121, 1126 n. 6 (11th Cir. 1983) (internal quotations omitted).

Heath Kellogg has at least a substantial claim for standing vis-a-vis the

Sterling Road Premises.  Although it was his father's residence, Heath Kellogg used it as his own for purposes of receiving certain financial records and for his business, Realseriousink.  Indeed, the Government's probable cause showing relies on Heath Kellogg's use of this premises for business and personal purposes.  The same evidence supports a finding of a privacy interest.  In the end, because the motions challenging this search fail on the merits, the Court need not make a definitive finding on the question of standing. Recognizing that Defendant Kellogg at least has made a serious showing of a privacy interest in the Sterling Road Premises, the Court will assume standing and explain why the motions nonetheless fail.

> 2.  The November 14th Warrant for the Sterling Road Premises Was Supported By Probable Cause

The information presented to Magistrate Judge Baverman in support of the November 14th warrant established a fair probability that evidence of the counterfeiting conspiracy would be found at the Sterling Road Premises. Moreover, even if probable cause could be questioned, the November 14th warrant application was not so lacking in probable cause so as to deprive a reasonable officer of the ability to rely in good faith on the duly issued warrant.  Suppression is not warranted under these deferential standards.

As noted above, the information in the warrant application showed that Heath Kellogg was involved in a counterfeiting conspiracy, based in part on the statements from Edikan Ekpo, surveillance linking Heath Kellogg to Stacy Smith, observations of Smith leaving the Don John Trail Premises prior to meeting other conspirators engaged in sales of counterfeit to a confidential informant, Heath Kellogg's criminal history, Heath Kellogg's substantial purchases of equipment and goods used to manufacture counterfeit currency, and Heath Kellogg's apparent attempts to avoid surveillance particularly after having purchased toner and other equipment.

Thus, Heath Kellogg's ongoing and current use of the Sterling Road Premises as a business mailing address showed a fair probability that evidence of the conspiracy would be found there.  According to the affidavit, Heath Kellogg purported to be self-employed at a graphic design business named Realseriousink, and the only known address associated with that business in law enforcement databases was the Sterling Road Premises.  November 14 Aff. ¶ 63.  It is common sense to infer that a "graphic design" business would be a good cover for a counterfeiting operation.  And because the only address for this business was the Sterling Road Premises, there was a fair probability that records relating to this business and linking it to Heath Kellogg would be found there.

Also, Heath Kellogg's three AT&T cellphones were all registered at the Sterling Road Premises. *See id.* ¶ 64.  The affidavit specifically noted that counterfeiters use cellular phones to facilitate their counterfeiting activity, *id.* ¶ 6. Moreover, several credit checks identified the Sterling Road Premises as Heath Kellogg's address, suggesting that he gave that address out to certain creditors and/or received mail there.  *Id.* ¶ 64.  This further suggests a fair probability that bills and financial records relating to Heath Kellogg and/or Realseriousink would be found at the Sterling Road Premises.

The agents also observed Heath Kellogg leaving the Sterling Road Premises holding a manila envelope on August 21, 2012.  On that same day, Heath Kellogg engaged in a variety of activity suggestive, at least when viewed in its entirety, of criminal activity.  On that day, he (a) engaged in a curious financial transaction, by using a cash machine at one merchant location and then crossing the street to another location to purchase a prepaid debit card, (b) rented a car to drive to OfficeMax to buy printer toner and ink cartridges, (c) appeared to attempt to evade surveillance by driving erratically and at high speeds, and ultimately by abandoning the rental car and entering a wooded area on foot, and (d) was seen during this period of counter-surveillance, after having made the equipment purchases, in the same shopping center where "Unc", Co-Defendant Smith, was

known to be.  *Id.* ¶¶ 72-81.  Heath Kellogg's use of and retrieval of a package from the Sterling Road Premises, during this day otherwise filled with suspicious activity, contributes to the common sense conclusion that evidence would fairly probably be found there.

James Kellogg's brief also challenges the timeliness of the information presented in the November 14th warrant application, arguing that it was too stale to support a finding of probable cause.  This fails.  First, the events on August 21, 2012 were less than three months prior to the warrant.  This was not so much of a delay as to compel the issuing Magistrate Judge to conclude the information was too stale.  Second, the warrant application suggested an ongoing counterfeiting operation involving Heath Kellogg and Stacy Smith, and that Heath Kellogg was using the Sterling Road Premises address in furtherance of the scheme.  The particular surveillance on August 21, 2012 was helpful to a showing of probable cause but was only part of the evidence of the ongoing conspiracy involving these premises.  Third, the nature of the criminal activity being investigated supported a finding of timeliness.  This was not a search for ephemeral evidence of a single discrete criminal act.  This was an ongoing financial conspiracy involving large investments in computer and commercial printers and other equipment, and the use of an apparent fake business, and the evidence sought included documents,

financial records, and even the equipment itself.  Common sense suggests that

these things are not so easily dissipated especially given the continual nature of the

conspiracy.  The events in the affidavit did not require a finding of staleness.

Thus, the issuing Magistrate Judge had a reasonable basis to find probable

cause and, in any event, a reasonable officer could rely in good faith on the warrant

as authorizing the search.

3.     The Search Of The Shed Was Authorized By The Warrant

James Kellogg made the further argument, adopted by Heath Kellogg, that

the agents' search of a detached shed in this backyard was not authorized by the

warrant, which defined the premises to be searched as:

772 Sterling Road, Marietta, GA 30066

The premises to be searched is a house located at 722 Sterling Road,
Marietta, GA 30066, along with any vehicles parked on the property.
There is a front door at the house, and a side door on the left of the
house from the street view.  The house is a one-story ranch style
house.  The driveway to the house is on the left side of the house from
the street view.  The mailbox at the street in front of the driveway that
leads to the house is marked with the numbers 772.

[148-1] at 50.

The Government argues that a search of the shed was implicitly authorized

because the shed was within the curtilage of the residence. [148] at 36-37. James Kellogg does not dispute that the shed was within the curtilage of the residence under the four factors set out by *United States v. Dunn*, 480 U.S. 294, 300 (1987) (considering the proximity of the area claimed to be curtilage to the home, whether the area is within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation). Rather, James Kellogg argues that the warrant did not authorize a search of outbuildings, within the residence's curtilage or not.

The warrant does not expressly mention the shed, and it defines the "premises to be searched" as only the house itself and any vehicles. But, as the Ninth Circuit has explained, "[e]very published opinion addressing the issue has concluded that a warrant authorizing the search of a residence automatically authorizes a search of the residence's curtilage." *United States v. Gorman*, 104 F.3d 272, 275-76 (9th Cir. 1996) (gathering authorities); *see also United States v. Earls*, 42 F.3d 1321, 1327 (10th Cir. 1994) (holding that a warrant that stated the street address and described the residence therein as the premises to be searched also necessarily authorized search of a detached garage, shed and office on the property, because those are "ordinarily a part of residential property" and "within the curtilage of the residence."). James Kellogg's argument that the warrant should

be limited to authorizing a search of just the residence–because just the residence is expressly mentioned–flies in the face of this uniform law.

James Kellogg's reliance on *United States v. Ridolf*, 76 F.Supp.2d 1305, 1310-11 (M.D. Ala. 1999) is misplaced. The warrant in that case did not authorize the search of a residence, but rather only a particular freezer unit on the property. *Ridolf* found that this limited warrant did not authorize the agents to also search a barn located nearby. *Id.* The warrant here was not so limited. It authorized search of the residence itself which, as *Gorman* explains, "automatically authoriz[ed] a search of the residence's curtilage." 104 F.3d at 275-76.

At a minimum, because "[e]very published opinion addressing the issue has concluded that a warrant authorizing the search of a residence automatically authorizes a search of the residence's curtilage," *Gorman*, 104 F.3d at 275-76, a reasonable agent could have relied in good faith on the belief that he was authorized to search the curtilage of the Sterling Road Premises. *Earls*, 42 F.3d at 1327 ("even if the officers had exceeded the scope of the warrant by searching the outbuildings, a review of the record convinces us that the fruits of the search would be admissible under the good-faith exception articulated in *United States v. Leon*.") (internal citation omitted).

The question therefore boils down to whether the shed was within the curtilage of the residence.  No Defendant disputes this finding, and the evidence cited by the Government supports it.  The agents did not testify to a precise distance between the shed and the house.  But the testimony established that the shed was within the property and "not far" from the back of the house. [128] at 33.  The shed was inside the fence that encircled the property.  *Id.*   The evidence did not suggest that the contents of the shed were concealed from individuals on the property.  To the contrary, the agents recalled that the windows of the shed did not even have glass and "it was just an open air."  *Id.* at 38.  All of this combines to support the finding–not disputed by Defendants–that the shed was within the curtilage of the residence.  Thus, the search of the shed was authorized or at least reasonable agents could have believed so in good faith.

Defendant James Kellogg's Motion to Suppress Evidence [113] as adopted by Defendant Heath Kellogg [115] should be denied.

D.   *Heath Kellogg's Challenge To The Search Of The Storage Unit, Consented to by Stacy Smith, Fails*

 Although he makes no specific argument, Defendant Heath Kellogg's post-hearing brief states that he challenges the search of "the storage unit."  Presumably, Defendant Kellogg refers to the search of the storage unit consented to by Co-

Defendant Smith. [129] at 284-293.

Thus, again assuming standing, *arguendo*[7], the Court will consider whether the agents' warrantless search of the storage unit was permissible. Heath Kellogg presents no arguments in this regard but the Court will consider the evidence of Defendant Smith's consent and the arguments made by Defendant Smith in support of his now-waived motions to suppress.

The agents verbally requested and obtained Defendant Smith's consent to search the storage unit (and Smith's cars) and also provided him a consent to search form that informed him of his rights. [129] at 285-287; Gov't Ex. 21. Defendant executed the form, indicating that he understood he could decline to consent to the search but nevertheless voluntarily consented. *Id.* All of this occurred after Defendant was advised of and agreed to waive his *Miranda* rights. *Id.* The Court finds on the basis of this evidence that Defendant Smith voluntarily consented to the search with knowledge of his right not to do so.

Defendant Smith's statements to the officers that he shared control over the

---

[7] The Eleventh Circuit has suggested, without deciding, that a defendant who has standing to contest a search at a particular premises necessarily can challenge the voluntariness of a co-occupant's alleged consent to that search. *See United States v. Gonzalez*, 71 F.3d 819, 828 n. 19 (11th Cir. 1996). Thus, the Court will assume, without deciding, that Heath Kellogg has standing to allege Stacy Smith's lack of voluntariness to the search of the storage unit to which they shared access.

storage unit, combined with his possession of the key, provided the officers sufficient reason to believe that Defendant Smith was authorized to consent.  There is no evidence that Defendant Kellogg as co-occupant ever refused consent or was physically present to do so.  Therefore, the voluntary consent by a fellow occupant with apparent authority, Defendant Smith, permitted the search.  *See Georgia v. Randolph*, 547 U.S. 103, 106 (2006); *United States v. Matlock*, 415 U.S. 164 (1974).

Defendant Smith never actually argued in his post-hearing brief [141] that his consent to search was involuntary.  Rather, he argued that his *Miranda* waiver, and his incriminating statements, were involuntarily given and should be suppressed in light of the Secret Service's pre-*Miranda* tactics.  [141] at 5-7.  Even though Defendant Smith has waived these points vis-a-vis himself by pleading guilty, the Court nevertheless considers whether these arguments suggest that the consent to search was involuntary.  The arguments fail to do so.

Defendant Smith points out that the agents entered his residence at 6:45 a.m. with weapons drawn, immediately restrained him, explained the evidence against him, and suggested that his cooperation would be "noted."   Only afterwards, approximately 25 minutes after entry, did the agents advise Defendant of his *Miranda* rights, and subsequently his right to refuse consent to search.  Defendant

Smith argued, before changing his plea, that Secret Service's tactics were coercive and designed to overbear his independent free will in deciding whether or not to waive his rights. *See* [141] at 5-7.

Defendant Smith's argument in his now-waived motion was meritless, and thus cannot help Defendant Kellogg vis-a-vis the evidence found in the storage unit.  Merely describing incriminating evidence to a defendant prior to the advice of rights does not render a subsequent waiver of those rights involuntary.  In *United States v. Gonzalez-Lauzan*, 437 F.3d 1128, 1131-1137 (11th Cir. 2006), federal agents sat with a defendant for over two hours describing their evidence against him before broaching the subject of *Miranda* and asking any questions of him.  The district court found, and the Eleventh Circuit affirmed the finding, that the waiver in that case was voluntarily and intelligently made and not coerced by the agents.  *Id.*   Here, the pre-*Miranda* period was much more brief. And, also unlike *Gonzalez-Lauzan*, in which the defendant blurted out a few incriminating statements during the two hours of pre-*Miranda* discussion[8], Smith apparently said nothing of substance until after waiving his rights.

_____

[8] The district court in that case suppressed the pre-*Miranda* statements, as the product of arguable "functional interrogation."  But despite the lengthy pre-*Miranda* functional interrogation the court denied suppression of the post-*Miranda* statements, and the Court of Appeals affirmed.  *Id.*

Courts have also found that agents do not coerce a waiver simply by advising that a suspect may benefit from cooperation. *See United States v. Okafor*, 285 F.3d 842, 846-47 (9th Cir. 2002). Indeed, "common sense may indicate that a suspect's recognition of the potential consequences of his or her crime may create incentives for cooperation." *Id.*

It remains that before making any incriminating statements, Defendant Smith was advised of his rights, indicated that he understood his rights, and indicated that he wished to voluntarily waive his rights. *See supra* at 15-16. The agents advised of his rights orally, and by providing him an advice-of-rights form so that he could read along. *Id.* Even after signing the waiver form, the Defendant still did not immediately confess. Rather, before answering the agents' questions, the Defendant first asked questions of his own, because "he wanted to know how much we knew about him." [129] at 281. Only after being shown a photograph of the suspected co-conspirator, Heath Kellogg, did Defendant Smith actually agree to talk. *Id.* This is perhaps the best evidence that Defendant fully understood that the agents could not compel him to speak, that the decision to speak was his, and that when he ultimately decided to speak it was because he decided of his own free will that it was in his best interest to do so. The same facts support a finding that Smith's subsequent consent to search was voluntary as well.

E.   *Heath Kellogg's Statements Were Voluntarily Given And In Compliance With Miranda*

Because the Defendant made incriminating statements during and after his arrest, he filed a motion requesting a hearing for the Government to demonstrate that the statements were made voluntarily and in compliance with *Miranda*.  [82]. The Government introduced testimony from Officer Mitchell and Special Agents Hamby and Herrera as to the circumstances of the statements obtained from Defendant Heath Kellogg. [128][129].  Defendant filed a post-hearing brief [139] that perfected certain arguments in light of the testimony established at the hearing, but which did not perfect any suppression argument based on *Miranda* and/or lack of voluntariness.  Rather, Defendant focused on moving to suppress the pre-trial identification by Ekpo, as well as the fruits of the search based on alleged deficiencies in the warrant application. [139].

It appears, therefore, that Defendant may have abandoned his original motion to suppress statements [82] based on a reasonable assessment that the facts established at the hearing failed to support the motion.  To the extent that Defendant still asserts his motion to suppress statements [82], it should be denied as meritless.

The arresting agents twice advised Defendant of his *Miranda* rights, and he

twice acknowledged that he understood those rights. [128] at 92-94; Gov't Ex. 7;

[129] at 295. Indeed, showing that he understood his rights, the Defendant initially

refused to talk without first consulting with an attorney. [128] at 93-94. The

Defendant then changed his mind, and reinitiated the prospect of an interview, by

saying "I wanted to talk about – can I talk now." *Id.* at 112. The Defendant may

have changed his mind because he knew based on what he saw and heard that the

agents were discovering incriminating evidence. But the Court does not find that

the agents engaged in any functional interrogation or trickery. And there is

nothing in the record that shows the Defendant's change of heart was involuntary.

The agents' caution in interviewing Defendant despite his invitation to do so

supports voluntariness. Instead of immediately interviewing him when he offered

to talk, the agents waited until the Defendant had been taken back to the Secret

Service field office and reminded of his *Miranda* rights. [129] at 294-295. The

agents arguably did not have to take this additional step, but that they did so helps

eliminate any question of involuntariness. *See Jacobs v. Singletary*, 952 F.2d

1282, 1294 (11th Cir. 1992) (a defendant may be interrogated after invocation of

*Miranda* rights so long as he re-initiates the conversation, by "evincing a

willingness and a desire for a generalized discussion about the investigation," and

the failure to repeat *Miranda* warnings is not a *per se* violation). And in the

interview, the Defendant was calm, relax and forthcoming, did most of the talking himself, and volunteered several details that the agents were unaware of. *Id.* at 296-297. These facts are more than sufficient to show compliance with *Miranda* and that the Defendant spoke voluntarily to the agents. Thus, Defendant's Motion to Suppress Statements [82] should be denied.

## III.   Cameron Longshore's Motion

Defendant Cameron Longshore filed a motion to suppress identification evidence [78] alleging that the Government conducted "showed a photo from Cameron Longshore's Driver's license and asked the Cooperating Defendant 'is this him?'" *Id.* at 2. Defendant moved to suppress such an out-of-court identification and whatever evidence was obtained as a result. *Id.*

The Government at the evidentiary hearing established that it had conducted no photo identification relating to Defendant Longshore with any cooperating defendant or any other non-law enforcement witness. [128] at 47-48. Rather, the Government showed that one of the Task Force Officers conducting surveillance on August 10, 2012 observed a dark-skinned African-American male with dreadlocks, a goatee, beard and mustache, who the Officer identified as Cameron Longshore based on a prior law enforcement photograph. *Id.* The Defendant

adduced no contrary evidence, indicating that any photo lineup by a cooperating defendant ever occurred.  Defendant Longshore has not filed any post-hearing brief perfecting his motion, apparently reflecting his abandonment of the motion in light of the evidence established at the hearing.

The Court finds that the motion as filed is meritless and should be denied. The identification hypothesized by the Defendant–and which is the entire basis of the motion–simply did not happen.  Defendant has not argued that the very different matter of the observations of a Task Force Officer conducting surveillance should be suppressed.

In any event, the record shows sufficient reliability.  The Officer described the individual he observed in detail, and he unhesitatingly identified that individual in Court as Defendant Cameron Longshore. [128] at 78-83.  Moreover, this identification was not one by a lay witness prone to suggestion by the intimidating official power of law enforcement.  This identification was by a trained law enforcement officer who was specifically tasked with surveilling the Defendant that evening.  That does not mean the identification was correct.  But it combines with other facts to present sufficient indicia of reliability to defeat a suppression argument.  Thus, Defendant Longshore's Motion [78] should be denied both as abandoned, and on the merits.

## CONCLUSION

Thus, the Court **GRANTS** Defendant Heath Kellogg's Motion to Adopt [115].

The Courts **RECOMMENDS** that Defendant Stacy Smith's motions to suppress and related motions [85][93][94][95][119]; Defendant James Kellogg's motions to suppress [73][113][137]; Defendant Kenyada Barrion's motions to suppress [75][86]; Defendant Heath Kellogg's motions to suppress [80][82] [84][102][108][109]; Defendant Heath Kellogg's Motion for Return of Property [81], and Defendant Cameron Longshore's Motion to Suppress [78], all be **DENIED**.

**IT IS SO RECOMMENDED** this 14th day of June, 2013.

_____

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE